# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 03-3780, 03-3764 & 03-3884

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

TERRAUN PRICE, also known as
BOO ROCK, TERENCE DILWORTH,
also known as T, and WILLIAM J.
DAVISON, also known as TALL ONE,

*Defendants-Appellants.*

_____

Appeals from the United States District Court for the
Northern District of Indiana, Hammond Division.
Nos. 01 CR 98 & 02 CR 44—**James T. Moody**, *Judge.*

_____

ARGUED FEBRUARY 25, 2005—DECIDED AUGUST 15, 2005

_____

Before BAUER, POSNER and RIPPLE, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Terence Dilworth, Terraun Price and
William Davison all were convicted of drug-related of-
fenses. They appeal their convictions and sentences on
several grounds. For the reasons set forth in the following
opinion, we affirm the defendants' convictions. We further
order, while retaining jurisdiction, a limited remand of this

case to the district court as required by *United States v. Paladino*, 401 F.3d 471 (7th Cir. 2005).

# I
# BACKGROUND

## A. Facts

We shall set forth here a brief rendition of the facts relevant to this appeal; the facts that bear specifically on the defendants' contentions on appeal will be discussed in greater detail further below.

The defendants' convictions stemmed from a federal investigation of the illegal drug trade in Gary, Indiana. At various times, the defendants became involved in a criminal conspiracy that existed to distribute crack cocaine and other drugs in the Concord neighborhood of Gary. The conspiracy, which existed from 1994 until 2001, eventually came to be led by Bobby Suggs. *See United States v. Suggs*, 374 F.3d 508, 512 (7th Cir. 2004). The conspiracy members trafficked in crack cocaine and other drugs near a government housing complex ("the Hill"). The defendants also were involved with Concord Affiliated ("CCA"), a rap group and a street gang associated with the well-known Vice Lords gang.

## B. District Court Proceedings

Mr. Price was indicted on June 20, 2001, along with 32 other individuals. He was charged with commission of three crimes: (1) conspiracy to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846; (2) use of a telephone to facilitate the commission of a felony, in violation of 21 U.S.C. § 843(b); and (3) possession of marijuana with intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Mr. Dilworth and Mr. Davison were indicted on June 7, 2002, along with four other individuals. Mr. Dilworth was charged with one count of conspiracy to distribute 50 grams or more of cocaine base, in violation of 21 U.S.C. § 846; and two counts of distribution of cocaine base, in violation of 21 U.S.C. § 841(a)(1). Mr. Davison was charged with the same crimes.

The defendants' cases were consolidated for trial. During the proceedings, the Government introduced evidence to which the defendants object in this appeal; this evidence will be discussed in greater detail below. The Government also introduced the testimony of Kenneth Lewis, a resident of the Concord neighborhood. The defendants now challenge the use of Lewis' testimony on the ground that it violates the principles set forth in *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

At the conclusion of the trial, the jury found Mr. Price guilty of conspiring to distribute 50 grams or more of cocaine base and using a telephone to facilitate the commission of a felony. Mr. Price was acquitted on the marijuana charge. The jury returned guilty verdicts against Mr. Dilworth on all counts against him. The jury found Mr. Davison guilty on both distribution counts against him but acquitted him on the conspiracy count.

The court sentenced the defendants believing the federal sentencing guidelines to be mandatory. The court sentenced Mr. Price to life in prison on the conspiracy count and to 48 months, to run concurrently with his life sentence, for the use of a telephone to facilitate the commission of a felony. Mr. Dilworth received a sentence of 360 months. Mr. Davison received a sentence of 360 months.

## II

## DISCUSSION

### A. Admission of Wiretap Evidence

During its investigation of the illegal drug trade in Gary, the FBI repeatedly sought the district court's permission to intercept telephone communications involving suspected members of the conspiracy. In January 2001, the FBI sought permission to extend a wiretap authorization that previously had been granted to intercept communications occurring to and from one phone number ("Target Number One"). In the same application, the FBI also sought authorization to intercept communications occurring to and from two other numbers ("Target Number Two" and "Target Number Three").[1] *See* 18 U.S.C. § 2518 (allowing a court to authorize interception of wire or other communications within the court's territorial jurisdiction). In an affidavit supporting the wiretap request, FBI Special Agent Anthony Riedlinger alleged that undercover agents had been unable to infiltrate the targeted conspiracy to buy drugs, that government informants had been beaten and threatened and that physical surveillance of targeted subjects had caused illegal activities to be moved elsewhere. The district court issued an order granting the FBI permission to intercept communications made to and from these three phone numbers. The recordings made pursuant to the authorized wiretaps revealed a conversation between Bobby Suggs, speaking from Target Number Three, and Mr. Price.

Before trial, Mr. Price moved to suppress the fruits of the wiretap that the district court had authorized. He alleged that "all" the communications the Government had intercepted by wiretap "were unlawfully intercepted" and that

---

[1] Target Number Two is not implicated in this appeal.

the "authorization . . . under which these communications were intercepted is insufficient on its face." Price's Sep. App., Tab C at 1.[2] The district court denied Mr. Price's motion to suppress, noting that the motion was "much too broad for the court to meaningfully evaluate it" and that it was "Price's responsibility . . . [to] narrow[ ] the field to the communications he believes were unlawfully obtained." Price's Sep. App., Tab D at 2. The wiretap evidence was admitted at trial over Mr. Price's renewed objection. On appeal, Mr. Price contends that the FBI's application for the wiretap did not establish probable cause and did not establish necessity as required by statute.

### 1. Standard of Review

This court reviews de novo a district court's finding that a wiretap application established probable cause. *See United States v. Dumes*, 313 F.3d 372, 379 (7th Cir. 2002). A district court's determination that an application established necessity for a wiretap is reviewed for abuse of discretion. *See id.* at 378-79.

### 2. 18 U.S.C. § 2518

Section 2518 of Title 18 outlines the requirements that must be met by an application to intercept wire, oral or electronic communications. First, a wiretap application must establish probable cause. *See* 18 U.S.C. § 2518(3)(a), (b) (court must determine that there is "probable cause for

---

[2] The documents referred to are part of Mr. Price's appendix. We have not been able to locate them in the record on appeal. The existence of the documents and their contents is not in contention.

belief that an individual is committing . . . a particular offense enumerated in section 2516 of this chapter" and "for belief that particular communications concerning that offense will be obtained through such interception").

A wiretap application also must establish necessity. *See id.* § 2518(1)(c) (application for wiretap must include a full and complete statement as to whether "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too danger- ous"). Statements asserting that the necessity requirement of § 2518(1)(c) has been met should "be reviewed in a practical and commonsense fashion." *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988). If the Govern- ment offers a "valid factual basis" for the necessity of a wiretap—alleging, for instance, that "informants and undercover agents could not infiltrate the drug conspiracy" or that "physical surveillance might alert the subject to the investigation"—the necessity requirement is met. *United States v. Ceballos*, 302 F.3d 679, 683 (7th Cir. 2002); *see also Dumes*, 313 F.3d at 378 ("[W]e will affirm a district court's finding that normal investigative procedures are not likely to be successful as long as there was a factual predicate in the affidavit." (internal quotation omitted)).

### 3.  The Wiretap Evidence in the Present Case

Mr. Price submits that Agent Riedlinger's affidavit did not establish probable cause because it relied on interpretations of everyday language to suggest drug activity. Mr. Price claims that this evidence would not "warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Woods v. City of Chicago*, 234 F.3d 979, 996 (7th Cir. 2000) (defining "probable cause"). Mr. Price also claims that Agent Riedlinger's application did not

establish necessity because, he contends, the application only referred to Target Number One.

The Government asserts that probable cause was shown because Agent Riedlinger's affidavit averred that a call had been intercepted between Target Number One, for which interception already was authorized, and Target Number Three, for which a wiretap was being sought. The person using Target Number Three was Bobby Suggs, who had been identified as a suspected member of the conspiracy. The Government also submits that necessity was shown by Agent Riedlinger's detailed account in his affidavit regarding the inability of investigators to generate evidence using traditional law enforcement techniques.

On the issue of probable cause, our review of Agent Riedlinger's affidavit leads to our independent conclusion that probable cause existed with respect to Target Number Three. In particular, the affidavit describes one recorded phone call between Target Number One and Target Number Three. In the phone call, Shawn Tarver (speaking from Target Number One) and Bobby Suggs (speaking from Target Number Three) discuss an upcoming "party" and where it was to take place. Price's Sep. App., Tab N at 31. Later in the conversation, Tarver states that he "just got supplied yesterday." *Id.* Furthermore, Agent Riedlinger's affidavit described the results obtained through a dialed number recorder used on Target Number Three. From October 2000 until January 2001, with court permission, the FBI made a record of the telephone calls made from and dialed to Target Number Three. The dialed number records showed numerous calls made to and from other targets of the investigation. We believe that, taken together, these circumstances constitute probable cause for the belief that Suggs and Tarver were engaged in drug offenses and for the belief that communications related to

the drug offenses would be obtained through the wiretap of Target Number Three.

Furthermore, Agent Riedlinger's description of the failure of ordinary investigative techniques is sufficient to establish necessity. Contrary to Mr. Price's submission, the content of the affidavit, when read in its totality, addresses necessity with respect to all three target numbers.

The affidavit relates that physical surveillance had not been of much value, both because the close-knit neighborhood in which the targets of the investigation lived made it hard to conceal police presence and because the targets had begun to conduct counter-surveillance. It was difficult for agents to obtain the help of cooperating witnesses because the strong bonds between CCA members made it unlikely that any high-ranking members would turn on their friends; the Government was not able to contact any cooperating witness that knew the details of the roles that the targets played in CCA operations. Furthermore, some of the targets had been informed that they were under investigation, which made the use of cooperating witnesses more dangerous. Agent Riedlinger also averred that undercover agents would not have been useful because the targets did not trust strangers. He also claimed that search warrants would have compromised the secrecy of the investigation. In view of all the contents of Agent Riedlinger's affidavit, we believe that the district court acted within its discretion when it concluded that the affidavit established a factual basis for the necessity of the wiretap.

On the record in this case, we must conclude that the Government established both probable cause and necessity through Agent Riedlinger's affidavit. Thus, we also conclude that the district court appropriately admitted the wiretap evidence at trial.

**B. Admission of Other Evidence**

Mr. Price and Mr. Dilworth take issue with several rulings of the district court admitting evidence at trial. We shall review the challenged evidence in more detail below.

### 1. Standard of Review

The Federal Rules of Evidence state that, generally, "[a]ll relevant evidence is admissible" and that "[e]vidence which is not relevant is inadmissible." Fed. R. Evid. 402. Relevant evidence is defined under the Rules as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. However, Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

We review a district court's evidentiary rulings for abuse of discretion. *See United States v. Brown*, 289 F.3d 989, 994 (7th Cir. 2002). "[E]ven erroneous evidentiary rulings will not be overturned if any resulting error was harmless." *United States v. Farmer*, 924 F.2d 647, 654 (7th Cir. 1991).

A point of particular contention between the parties in this appeal is whether an objection to evidence on Rule 403 grounds must be asserted separately from an objection to that evidence based on relevance. In this circuit, "[a] general objection to 'relevance[ ]' . . . is not sufficient to preserve an objection under Rules 404(b) or 403." *United States v. Mejia*, 909 F.2d 242, 246 (7th Cir. 1990); *see also United States v. Carroll*, 871 F.2d 689, 691 (7th Cir. 1989) (noting the general

rule that the specific basis for reversal of an evidentiary ruling on appeal must be the same as the one raised at trial). When a party has failed to raise at trial the specific ground on which he appeals the trial court's evidentiary ruling, this court reviews only for plain error. *Mejia*, 909 F.2d at 247; *see also* Fed. R. Crim. P. 52(b); Fed. R. Evid. 103(d). In the evidence context, "[a] 'plain error' is one that results in 'an actual miscarriage of justice,' which implies that the defendant 'probably would have been acquitted' but for the erroneously admitted evidence." *Mejia*, 909 F.2d at 247 (quoting *Carroll*, 871 F.2d at 692).

### 2. Weapons from 1770 Hanley Street

Pursuant to a search warrant, government agents in May 2001 searched 1770 Hanley Street in Gary, the home of Bobby Suggs, Sr. and Warena Suggs. Bobby, Sr. and Warena are the parents of Bobby Suggs, and of another convicted conspirator, Seantai Suggs. The search resulted in the discovery of four weapons ("the Hanley Street weapons"): a .357 caliber handgun, a .38 caliber handgun, a .44 caliber magnum handgun and a .20 gauge sawed-off shotgun. The Hanley Street weapons were admitted in evidence at trial over the defendants' Rule 403 objection.

On appeal, the defendants contend that the district court abused its discretion by admitting the Hanley Street weapons. They contend that the admission of the weapons impermissibly "inflame[d] the passions of the jury," Dilworth's Br. at 28, and were not probative of the existence of a conspiracy because Bobby, Sr. and Warena were not identified in the Government's evidentiary proffer as members of the conspiracy. The Government, on the other hand, contends that the Hanley Street weapons were highly

probative of the existence of a conspiracy in light of the fact that Bobby and Seantai Suggs had access to their parents' home.

This court previously has remarked that "guns are tools of the drug trade and are therefore relevant evidence in a drug case." *United States v. Van Dreel*, 155 F.3d 902, 906 (7th Cir. 1998). We conclude that the district court acted within its discretion in admitting into evidence the Hanley Street weapons.

### 3. Gary Police Alert

The defendants also challenge the admission of a Gary Police Department intelligence alert ("the police alert"), a document seized from Bobby, Sr. and Warena Suggs' home at 1770 Hanley Street.[3] The document was prepared by the Gary Police. It listed known members of CCA, including Mr. Dilworth and Bobby and Seantai Suggs (but not Mr. Price or Mr. Davison). The defendants contended at trial that the document was irrelevant, that it was hearsay and that it violated the Confrontation Clause of the Sixth Amendment. The district court held that the document was non-hearsay because it was not offered to prove that the listed men were members of CCA, but rather was offered to show that CCA was engaging in counter-surveillance. On appeal, the defendants contend that the district court committed an abuse of discretion by failing to exclude the

---

[3] Mr. Dilworth's brief also mentions, in the same heading that concerns the police alert, a piece of evidence to which he does not direct any further argument in the body of his brief: "the Vice Lords Oath." Dilworth's Br. at 28. The defendants make no further mention of the oath, and they did not address it at oral argument. Consequently, we shall not address it either.

police alert on the grounds of relevance, hearsay and the Sixth Amendment Confrontation Clause.

The district court was well within its discretion in over-ruling the defendants' relevance objection to the police alert. Evidence that members of an alleged conspiracy were conducting counter-surveillance of police activity certainly makes more probable the existence of a conspiracy to break the law.[4]

Furthermore, the district court acted well within its discretion when it concluded that the police alert was not hearsay. Although it constitutes an out-of-court statement, the police alert was not "offered in evidence to prove the truth of the matter asserted," and therefore it is not hearsay. Fed. R. Evid. 801(c). Although the police alert includes Mr. Dilworth's name as a member of an alleged conspiracy, the alert was not introduced to prove that assertion. When the Government sought to introduce the police alert at trial, it argued that the alert was being introduced "to show that it was found in Bobby Suggs' home" and "to show counter-surveillance." Tr.IV at 10. The Government explicitly stated that the police alert was not being introduced "in the record to argue that because of [the police alert], these people are members of a gang." *Id.* The district court did not abuse its discretion in failing to exclude the police alert on hearsay grounds.

---

[4] In other of our cases, we have considered evidence of counter-surveillance as relevant to certain aspects of a conspiracy. *Cf. United States v. Carillo*, 269 F.3d 761, 771 (7th Cir. 2001) (noting that defendant's role in a conspiracy had not been a minor one when he had conducted counter-surveillance for the members of the conspiracy).

Finally, our determination that the police alert was not hearsay leads us to conclude that there is no merit to the defendants' contention that admission of the police alert violated the Confrontation Clause of the Sixth Amendment. The defendants correctly point out that the Supreme Court held in *Crawford v. Washington*, 541 U.S. 36, 68 (2004), that the admission of testimonial hearsay evidence at trial, when the witness is unavailable and the defendant has had no opportunity to cross-examine the witness, violates the Confrontation Clause of the Sixth Amendment. However, the Court in *Crawford* also noted explicitly that the Confrontation Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted."[5] *Id.* at 59 n.9 (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985) (holding that "*nonhearsay* aspect of . . . confession" raised "no Confrontation Clause concerns" (emphasis in original))). The police alert was not introduced to prove the truth of the matters asserted in it. The district court therefore committed no error in failing to exclude the police alert on Sixth Amendment Confrontation Clause grounds.

---

[5] Although we decide the Confrontation Clause issue on the ground that the police alert was not used to establish the truth of the matters asserted therein, we also point out that the police alert may not fall within the definition of "testimonial" evidence for purposes of the Sixth Amendment. In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Court "le[ft] for another day any effort to spell out a comprehensive definition of 'testimonial.' " The Court noted that the definition of "testimonial" includes, "at a minimum," "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and . . . police interrogations." *Id.*

### 4. Weapons from 1727 Clinton Street

On April 25, 1996, Gary police officer James Gaskey chased a suspect into 1727 Clinton Street, a drug house out of which Bobby Suggs sold crack cocaine. Inside 1727 Clinton Street, Officer Gaskey made several arrests and discovered twelve weapons ("the Clinton Street weapons"). When the Government sought to introduce these weapons, the defendants objected on relevance grounds. The court overruled the objection.

On appeal, the defendants assert that the district court should have excluded the weapons on relevance grounds and on Rule 403 grounds. They submit that the Clinton Street weapons were not relevant because there was no indication of who lived at 1727 Clinton Street. The Government contends that the Clinton Street weapons were relevant because they had some tendency to show that Bobby Suggs was leading a conspiracy to sell crack cocaine near the Hill.

The district court acted within the bounds of its discretion when it overruled the defendants' relevance objection. As we already have noted, evidence of weapons is relevant in a drug case. Furthermore, Officer Gaskey testified at trial that Bobby Suggs, the alleged leader of the drug conspiracy, was present at 1727 Clinton Street when the weapons were seized. Thus, the presence of weapons was relevant to establishing the existence of the conspiracy.

The defendants also seem to contend on appeal that the Clinton Street weapons were more prejudicial than probative and should not have been admitted into evidence. *See* Dilworth's Br. at 30 ("[T]his evidence was offered solely to influence the emotions of the mostly white jury."). Because the defendants did not raise a Rule 403 objection to these weapons at trial, the assertion that the weapons were more prejudicial than probative should be reviewed only for plain

error. We certainly cannot conclude that the district court committed plain error in admitting the weapons. As the Government points out, there were numerous other weapons introduced at trial and attributed to the conspiracy. We simply cannot say, in light of the other evidence introduced at trial, that "an actual miscarriage of justice" resulted from the introduction of the guns seized from 1727 Clinton Street. *See Carroll*, 871 F.2d at 692.

### 5. Pole Camera Video Tape

As part of the FBI's surveillance activities, a camera was installed on a telephone pole near the Hill from October 1996 to March 1997. At trial, the Government played some of the tape recorded by the pole camera. The defendants objected at trial on relevance and hearsay grounds, but did not raise a Rule 403 objection.

On appeal, the defendants contend that the tape was irrelevant because it did not provide enough detail to show the identity of persons filmed; they also contend that the tape was prejudicial and confused the jury. The Government asserts that the tape was relevant because it tended to show that organized drug dealing occurred near the Hill.

In view of the high degree of deference accorded to a district court's evidentiary rulings, we must conclude that the court did not abuse its discretion by failing to exclude the pole camera tape on relevance grounds. We do not believe that admission of the pole camera tape was error because the tape, which showed unidentifiable individuals engaging in what a police officer testified appeared to be drug transactions, made more probable the existence of a drug conspiracy operating around the Hill.

With respect to the defendants' contention that the introduction of the pole camera tape was prejudicial and con-

fusing, we must conclude that the defendants have not established that the district court committed plain error in admitting the tape. Even assuming that it would have been error to admit the pole camera tape over a proper Rule 403 objection, it was not prejudicial to the defendants. The pole camera tape merely displayed drug activity on the Hill to which other witnesses already had testified. The fact that this gave the jury a physical, as opposed to a mental, picture of that activity does not render the tape unduly prejudicial. On the facts of this case, we cannot say that the introduction of the pole camera tape resulted in "an actual miscarriage of justice." *Carroll*, 871 F.2d at 692.

### 6. Photographs Seized from Laidback Records

In May 2001, FBI agents executed a search warrant at Laidback Records, the recording label for the CCA rap group. Several photographs were seized from Laidback Records and were admitted at trial. One photograph showed Mr. Dilworth, along with Bobby Suggs, Seantai Suggs and other co-conspirators, sitting atop an SUV. Mr. Price appeared in two other photographs; in one, he was seated in a car in which another passenger was carrying a handgun. At trial, the defendants objected to the photographs on relevance grounds, and the district court overruled the objection.

On appeal, the defendants submit that the district court abused its discretion by failing to exclude the photographs on relevance grounds. For the first time on this appeal, they raise Rule 403 grounds.

Turning to the relevance objection, the district court did not abuse its discretion. The photographs established a connection among the defendants and therefore were relevant

because they had the tendency to make the defendants' participation in the conspiracy more likely.

With respect to the alleged Rule 403 error, which we review only for plain error, we conclude that there was no "actual miscarriage of justice," *Carroll*, 871 F.2d at 692, from the admission of the photographs. The photographs were indeed probative of the defendants' associations with other conspirators, and the danger of prejudice from the photographs was minimal in light of the fact that numerous other photographs admitted into evidence at trial showed the defendants associating with other gang members and flashing gang symbols. Therefore, the defendants cannot prevail on this ground. The district court properly admitted into evidence the photographs seized at Laidback Records.

### 7. Song Lyrics

At trial, the Government introduced "One Life 2 Live," a compact disc recorded by the CCA rap group; a music video made by the CCA rap group; and the lyrics to "COKE," a song from the "One Life 2 Live" CD. The district court admitted the CD, the music video and the song lyrics over the defendants' objections. Specifically, the defendants objected to these items on relevance grounds and, later, objected to the song lyrics on Rule 403 grounds. In its oral rulings on the objections, the district court stated that the evidence "of the jargon that's pervasive in the drug trade" would aid the jury. Tr.V at 174.

On appeal, the defendants contend that the "COKE" song lyrics should not have been admitted at trial because the danger of unfair prejudice from their admission outweighed their probative value. We review this claim for abuse of discretion.

We have held in the past that rap lyrics, because they reflect "urban life" and "the reality around [the song's] author," can be relevant to drug crimes. *United States v. Foster*, 939 F.2d 445, 456 (7th Cir. 1991). In this case, the lyrics were possibly of some help to the jury in assessing the evidence. However, the possible prejudicial value of these song lyrics certainly gives us pause. Nonetheless, regardless of whether the district court was in error in overruling the defendants' Rule 403 objection to the song lyrics, we shall not overturn its ruling because any error that resulted from the admission of the lyrics was harmless. *See Farmer*, 924 F.2d at 654. The district court admitted the song lyrics in order for them to be interpreted by a federal agent with specialized knowledge of the drug trade, and it appears that the lyrics were used in that manner at trial. Moreover, it was made clear at trial that the authorship of the song was unknown; it was not attributed to any of the defendants. We conclude that the admission at trial of the lyrics, if in error, was harmless.

### 8. Mr. Dilworth's Past Arrest for Drug Dealing

In September 1994, an undercover Gary police officer observed Mr. Dilworth engaging in drug dealing near the Hill. Mr. Dilworth was arrested after he left the Hill; a post-arrest search of his person did not recover any drugs. At trial, Mr. Dilworth objected to the officer's testimony regarding that arrest on the ground that it was inadmissible under Federal Rule of Evidence 404(b). The Government argued that it was evidence of an overt act in furtherance of the conspiracy. The court overruled Mr. Dilworth's objection.

On appeal, Mr. Dilworth argues that the district court abused its discretion by failing to exclude the undercover

officer's testimony on Rule 404(b) grounds. The Government contends that the officer's testimony was admissible because Mr. Dilworth's drug dealing constituted an overt act in furtherance of the conspiracy in which Mr. Dilworth was alleged to have participated.

According to Rule 404(b), the Government may not introduce evidence of a defendant's "prior misconduct merely to demonstrate 'that a defendant has a propensity to commit crime and that he acted in conformity with that propensity on the occasion in question.' " *United States v. Hughes*, 310 F.3d 557, 564 (7th Cir. 2002) (quoting *United States v. Best*, 250 F.3d 1084, 1090 (7th Cir. 2001)). However, the Government may present evidence of prior misconduct in order to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

This court uses a four-prong test to determine whether evidence of prior misconduct is admissible under Rule 404(b). According to the test,

> [e]vidence of prior crimes, wrongs, or acts may be admitted when: (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged; (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue; (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act; and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Asher*, 178 F.3d 486, 492 (7th Cir. 1999).

Mr. Dilworth's submissions to this court do not make particularly clear on which of these prongs he bases his arguments. Nonetheless, we must conclude that the district

court acted within its discretion in admitting the evidence of Mr. Dilworth's prior arrest for drug dealing over a Rule 404(b) objection. First, the evidence establishes opportunity, plan and knowledge on Mr. Dilworth's part with respect to the charges of conspiracy and drug trafficking. Second, the evidence of Mr. Dilworth's September 1994 arrest is similar in nature and close in time to the charges against Mr. Dilworth. Mr. Dilworth was charged with participating in a conspiracy to sell drugs beginning in 1994 and the actions that led to the arrest are quite similar to the charged conspiracy. Third, although there is, as Mr. Dilworth himself points out, no evidence that he ever was prosecuted or convicted based on the September 1994 arrest, we think that the undercover officer's testimony at trial provided sufficient evidence to allow a jury to conclude that Mr. Dilworth committed the similar act. Finally, we believe that the probative value of the evidence of the arrest outweighs its prejudicial value.

Thus, we must conclude that evidence of Mr. Dilworth's arrest for drug dealing was admissible Rule 404(b) evidence and, therefore, that the district court did not abuse its discretion in allowing the officer to testify regarding Mr. Dilworth's arrest.

### 9. Drugs Discovered in Mr. Dilworth's Vehicle

In June 1995, Gary police officer Phillip Pardus made a traffic stop of a vehicle driven by a high-level member of CCA. Officer Pardus conducted a consensual search of the vehicle. The vehicle that was the subject of the stop was owned by Mr. Dilworth. In Mr. Dilworth's car, Officer Pardus found several baggies containing crack cocaine.

At trial, Mr. Dilworth objected to Officer Pardus' testimony regarding the drugs on several grounds, one of which was Rule 403. He again raises the Rule 403 argument on appeal and also belatedly argues that the evidence of drugs was irrelevant.

The district court's conclusion that the probative value of Officer Pardus' testimony outweighed the danger of unfair prejudice was not an abuse of its discretion. The evidence clearly had probative value because it tended to show that Mr. Dilworth had loaned his car to another member of the conspiracy. Furthermore, the risk of unfair prejudice to Mr. Dilworth was low. For instance, as Officer Pardus testified, there was no concern that the vehicle was being used without the owner's permission because "[t]here didn't appear to be any signs or indications that the car was stolen." Tr.IV at 200.

Mr. Dilworth did not raise a relevance objection at trial, but even if he had, admitting Officer Pardus' testimony would not have been error, let alone error that is plain. His testimony was relevant because it connected Mr. Dilworth to other members of the conspiracy, thus making it more probable that Mr. Dilworth was himself a member of the conspiracy. Therefore, we cannot conclude that the district court committed plain error by admitting Officer Pardus' testimony.

### C. Testimony of Kenneth Lewis

Kenneth Lewis testified at trial as a government witness. As a neighbor of Mr. Price and a resident of the Concord area, Lewis testified to having seen members of the conspiracy selling crack cocaine. Lewis also testified that he had purchased crack cocaine from members of the conspiracy. At trial, the Government claimed that it never had promised

Lewis, in exchange for his testimony, that he would not be charged with a crime. At Mr. Dilworth's sentencing hearing, when asked whether the Government had promised Lewis that he would not be charged, FBI Agent Bradley Bookwalter replied that he was not sure but that an Assistant United States Attorney might have made such a promise. Agent Bookwalter also stated that any promises would have been documented in reports that were turned over to the defendants. In this appeal, Mr. Price and Mr. Dilworth both contend that the Government's failure to disclose the agreement is a ground for a new trial based on *Brady*, 373 U.S. 83.

The Supreme Court in *Brady* held "that the suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. A district court has broad discretion to determine *Brady* violations, and we review the court's exercise of that discretion for abuse. *See United States v. Knight*, 342 F.3d 697, 705 (7th Cir. 2003), *cert. denied sub nom. Williams v. United States*, 540 U.S. 1227 (2004).

To prove a *Brady* violation, a defendant must show: (1) that the "evidence at issue [is] favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) that the evidence was "suppressed by the State, either willfully or inadvertently"; and (3) that "prejudice . . . ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). The third prong also has been phrased in terms of whether "the evidence was material to an issue at trial." *Boss v. Pierce*, 263 F.3d 734, 740 (7th Cir. 2001). The Supreme Court has held that evidence that a witness who testified for the Government was the beneficiary of an "understanding or agreement as to a future prosecution" is "relevant to [that witness'] credibility" and that, in some circumstances, the

suppression of such information will violate an accused's right to due process. *Giglio v. United States*, 405 U.S. 150, 154-55 (1972); *see also Crivens v. Roth*, 172 F.3d 991, 998 (7th Cir. 1999).

Mr. Price and Mr. Dilworth contend that the Government committed a *Brady* violation when it failed to disclose its agreement with Lewis, because Lewis' testimony was material at trial and because evidence of the agreement would have impeached Lewis' credibility. Although Agent Bookwalter at one point alluded to a possible agreement between the Government and Lewis, he admitted that he did not speak with certainty. Furthermore, as the Government points out, no document suggests any promise from the Government to Lewis. Because there was no promise, no *Brady* violation occurred and Mr. Price and Mr. Dilworth are not entitled to new trials.

### D. Sentencing

Mr. Price, Mr. Dilworth and Mr. Davison contend that they are entitled to resentencing because their sentences violate the Sixth Amendment as interpreted in *United States v. Booker*, 125 S. Ct. 738 (2005) (holding that federal sentencing guidelines are not mandatory and rendering the guidelines effectively advisory). Because none of the defendants raised the proper objection before the district court, we review for plain error. *United States v. Paladino*, 401 F.3d 471, 480-81 (7th Cir. 2005).

The test for plain error dictates that, "before an appellate court can correct an error not raised at trial, there must be (1) 'error,' (2) that is 'plain,' and (3) that 'affect[s] substantial rights.'" *United States v. Cotton*, 535 U.S. 625, 631 (2002) (quoting *Johnson v. United States*, 520 U.S. 461, 466-67 (1997)). If those three conditions are met, "'an appellate court may

then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson*, 520 U.S. at 467).

### 1. Mr. Price's Sentence

Under the federal sentencing guidelines, the jury's verdict on the conspiracy charge against Mr. Price required a base offense level of 32. *See* U.S.S.G. § 2D1.1(c)(4) (at least 50 grams but less than 150 grams of cocaine base). The district court determined that the total amount of cocaine base attributable to Mr. Price was more than 1.5 kilograms, which increased the base offense level to 38. *See id.* § 2D1.1(c)(1). The district court applied a two-level enhancement for possession of a dangerous weapon in connection with a drug offense, *see id.* § 2D1.1(b)(1), and a three-level enhancement for Mr. Price's role as a supervisor or manager of the criminal activity, *see id.* § 3B1.1(b).[6] The enhanced offense level, combined with Mr. Price's criminal history category of IV, required a life sentence. The court also sentenced Mr. Price to a term of 48 months for his conviction for using a telephone to facilitate the commission of a felony, to be served concurrently with the life sentence.

Turning to our plain error analysis, the district court in this case based Mr. Price's sentence on supplemental facts neither admitted by Mr. Price nor proven to the jury beyond a reasonable doubt, an action which we have recognized to "violate[ ] our new understanding of the Sixth Amendment

---

[6] Mr. Price contends that the district court applied to his sentence a two-level enhancement for CCA's use of a minor as a lookout. However, the transcript from Mr. Price's sentencing does not contain any reference to such an enhancement.

as divined by *Booker*, . . . thereby constitut[ing] error." *United States v. White*, 406 F.3d 827, 835 (7th Cir. 2005). Additionally, the district conducted the sentencing believing, understandably, the federal sentencing guidelines to be mandatory. The first two prongs of the plain error test are therefore satisfied. *See id.*; *see also United States v. Castillo*, 406 F.3d 806, 824 (7th Cir. 2005) (holding that mandatory application of the Guidelines is error that satisfies the first two prongs of test for plain error). However, with respect to the third and fourth prongs of the plain error test, we must conclude that we cannot, on this record, determine "what the district court would have done with the additional sentencing discretion now afforded by *Booker*." *Castillo*, 406 F.3d at 825. Thus, while retaining jurisdiction, we order a limited remand to the district court for proceedings consistent with our decision in *Paladino*, 401 F.3d at 483-84.

### 2. Mr. Dilworth's Sentence

At sentencing, the district court found at least 1.5 kilograms of cocaine base attributable to Mr. Dilworth's offenses, which established a combined offense level of 38. *See* U.S.S.G. § 2D1.1(c)(1) (1.5 kilograms or more of cocaine base). The district court also applied a two-level enhancement for possession of a dangerous weapon in connection with a drug offense. *See id.* § 2D1.1(b)(1). The resulting offense level of 40, along with Mr. Dilworth's criminal history category of III, called for a sentencing range of 360 months to life. The court sentenced Mr. Dilworth to 360 months' imprisonment on each of his three convictions, with the sentences to run concurrently.

With respect to Mr. Dilworth's sentence, the first two prongs of the test for plain error are established by the district court's reliance on facts that were neither admitted by Mr. Dilworth nor proven to the jury beyond a reasonable

doubt and by the mandatory application of the guidelines. *See White*, 406 F.3d at 835. While retaining jurisdiction over this appeal, we order a limited remand of Mr. Dilworth's case for proceedings consistent with *Paladino*, so that we may complete our plain error analysis.

### 3. Mr. Davison's Sentence

The jury's verdict against Mr. Davison on the two distribution charges required a base offense level of 18, *see* U.S.S.G. § 2D1.1(c)(11) (at least 1 gram but less than 2 grams of cocaine base), which would have carried a sentence of 27 to 33 months. However, despite the fact that the jury had acquitted Mr. Davison on the conspiracy charge, the district court at sentencing found by a preponderance of the evidence that Mr. Davison had been a member of the conspiracy and that more than 1.5 kilograms of cocaine base were attributable to him as a result. These findings elevated Mr. Davison's combined offense level to 38. *See id.* (1.5 kilograms or more of cocaine base). The district court also applied a two-level enhancement to Mr. Davison's sentence for possession of a dangerous weapon in connection with a drug offense. *See id.* § 2D1.1(b)(1). The final offense level of 40, taken together with Mr. Davison's criminal history category, yielded a sentencing range of 292 to 365 months. The district court sentenced Mr. Davison to 360 months' imprisonment, to consist of two 180-month terms of imprisonment running consecutively.

As with his codefendants' sentences, we must conclude that Mr. Davison's sentence fulfills the first two prongs of plain error because the district court's sentence was based on facts neither admitted by Mr. Davison nor proven to the jury beyond a reasonable doubt and because the court sentenced him believing that the guidelines were mandatory.

We order a limited remand, while retaining jurisdiction, for proceedings consistent with our decision in *Paladino*.

The district court found for sentencing purposes that Mr. Davison was a member of the conspiracy despite the fact that the jury acquitted him on the conspiracy charge. In *United States v. Watts*, 519 U.S. 148 (1997), the Court held that a court is permitted to consider a broad range of information for sentencing purposes, including conduct related to charges of which the defendant was acquitted. *See id.* at 152-55. The Court based its holding, in part, on 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."), *see Watts*, 519 U.S. at 151, and also on the notion that "different standards of proof . . . govern at trial and sentencing," *id.* at 155.

We join all the other courts that have confronted the issue in holding that the Supreme Court's holding in *Watts* remains the law after *Booker*.[7] *See Booker*, 125 S. Ct. at 754-55

---

[7] Other circuits similarly have concluded that *Watts* continues to apply after *Booker*. *See, e.g., United States v. Magallanez*, 408 F.3d 672, 684 (10th Cir. 2005) (holding that *Watts*, along with 18 U.S.C. § 3661, "remains in full force" after *Booker*); *United States v. Duncan*, 400 F.3d 1297, 1304-05 (11th Cir. 2005) (noting that, after *Booker*, "sentencing judges can continue to consider relevant acquitted conduct when applying the Guidelines in an advisory manner") *petition for cert. filed* (U.S. July 20, 2005) (No. 05-5467). Furthermore, overruling a precedent of the Supreme Court of the United States is the province of the Supreme Court alone. *See State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's
(continued...)

(remarking that "[n]one of our prior cases is inconsistent with today's holding" and specifically reviewing the holding of *Watts*); *cf. id.* at 760 (noting that preventing sentencing court from finding facts relevant to sentencing "would undermine the sentencing statute's basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways").

### Conclusion

For the foregoing reasons, we affirm the defendants' convictions. While retaining jurisdiction, we remand this case to the district court for proceedings consistent with this opinion.

IT IS SO ORDERED

A true Copy:

Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*

---

[7] (...continued)
prerogative alone to overrule one of its precedents.").

---