In the

# United States Court of Appeals
## For the Seventh Circuit

_____

Nos. 05-2910 & 05-2962

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN L. TOLLIVER and ARCHIE DUNKLIN, JR.,

*Defendants-Appellants.*

_____

Appeals from the United States District Court
for the Southern District of Illinois.
No. 04 CR 40014—**J. Phil Gilbert**, *Judge.*

_____

ARGUED APRIL 12, 2006—DECIDED JULY 19, 2006

_____

Before POSNER, RIPPLE, and MANION, *Circuit Judges.*

MANION, *Circuit Judge.* A jury convicted John Tolliver and
Archie Dunklin of conspiring to distribute and possess with
intent to distribute 50 grams or more of crack cocaine. The
district court sentenced Tolliver and Dunklin to 240 and 360
months of imprisonment, respectively. The defendants
appeal, raising two evidentiary arguments and challenging
portions of the jury instructions. We affirm in all respects.

**I.**

The grand jury in this matter issued a superseding indictment (hereinafter "the indictment"), charging John Tolliver and Archie Dunklin with one count of conspiring to distribute and possess with intent to distribute 50 or more grams of crack cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. According to the indictment, Tolliver and Dunklin perpetrated this conspiracy with someone named Reginald Walls and other unnamed persons from January 2002 to March 2004. The conspiracy primarily entailed purchasing crack cocaine in St. Louis, Missouri and selling it in DuQuoin, Illinois.

The cases against Tolliver and Dunklin were tried jointly in March 2005. In a three-day trial, the government called more than a dozen witnesses, including Walls, to show that during the relevant period Tolliver and Dunklin each made numerous trips with an assortment of people to St. Louis to purchase varying quantities of crack cocaine. This evidence further showed that they transported the crack cocaine back to DuQuoin, where they sold it. These witnesses included those who traveled with the two to St. Louis as part of the conspiracy, others who sold crack cocaine to the conspiracy, and still others who purchased crack cocaine from the conspiracy. According to these witnesses, the conspiracy trafficked in well over 50 grams of crack cocaine. Also, according to the trial testimony, Dunklin once purchased powder cocaine in Memphis, Tennessee, and, upon returning to DuQuoin, converted it into more than 170 grams of crack cocaine.

Beyond this general background, three segments of the trial are pertinent to this appeal. First, in addition to the aforementioned testimony and other evidence, the government played two audiotapes for the jury concerning

Dunklin. Each tape contained a recorded conversation between Dunklin and a confidential informant named Charles Shye. During the conversations, Shye made controlled purchases of crack cocaine from Dunklin. Shye did not testify at trial, but the government authenticated the tapes through the testimony of a police detective named Jamie Ellermeyer, who worked with Shye on the controlled buys and the recordings. Additionally, the government introduced the crack cocaine that Dunklin sold to Shye during each conversation.

Second, Tolliver (unlike Dunklin) took the stand in his own defense. Tolliver was the only defense witness at trial. On direct examination, Tolliver confessed to being a "crack addict" but denied the conspiracy charge against him, attempting to paint himself as anything other than a drug dealer. To further his claim of innocence, Tolliver asserted that he had no reason to sell drugs because he earned a legitimate income as a mechanic. At one point, for instance, he stated: "I have no reason to sell crack. I worked all my life." During his direct examination, Tolliver also attempted to blunt the testimony of Walls, the co-conspirator named in the indictment. Tolliver flatly rejected Walls's statements that, during the relevant period, Tolliver purchased crack cocaine in St. Louis and resold it in DuQuoin. Tolliver further denied that he had "ever conducted any drug business with" Walls.

On cross-examination, the government probed the veracity of these denials. Specifically, the government, after the district court overruled Tolliver's objection at sidebar, asked Tolliver about his prior drug dealings, including a conviction from 1992. Before trial, the district court had ruled that the government could not raise matters related to that conviction, but, after hearing Tolliver testify,

the district court allowed the government to bring up those matters in response to Tolliver's testimony. Through this questioning, Tolliver admitted selling one crack-cocaine-laced marijuana cigarette in 1991 and acknowledged pleading guilty in 1992 to a corresponding state felony charge. The government then inquired if, in relation to that episode, Tolliver had spoken with the police about becoming a confidential source against Walls. In that regard, Tolliver denied ever telling the police that he could obtain crack cocaine from Walls. He also denied informing the police, in the context of that 1991-1992 investigation, that he had been with Walls when Walls had brought crack cocaine back from East St. Louis, Illinois to DuQuoin.

The government then called a retired DuQuoin police officer named Gary Darnell as a rebuttal witness. Darnell worked on the aforementioned 1991-92 case, and his testimony refuted key points of Tolliver's testimony. Darnell reported that Tolliver had sold, not one, but four crack-cocaine-laced marijuana cigarettes to undercover officers in 1991. Darnell also stated that, during the follow-up investigation, he had spoken to Tolliver about becoming a confidential source. In that context, according to Darnell, Tolliver styled himself as a drug trafficker, stating that he could obtain crack cocaine from Walls for Darnell's investigation. According to Darnell, during that investigation, Tolliver also stated that he had been with Walls in East St. Louis and brought crack cocaine back to DuQuoin.

Third, after each side rested, attention turned to jury instructions. Three instructions are important to this appeal. The district court's Instruction 6 introduced the indictment as the relevant charging document, cautioning that it was not evidence of guilt. Instruction 11 defined the elements of the crime and told the jury that, to convict, the government

had to prove "that the conspiracy as charged in the Super-seding Indictment existed." In turn, the indictment, as is customary in the post-*Apprendi*[1] world, referenced the necessary drug quantity for sentencing purposes: alleging that the defendants "conspire[d] . . . to knowingly and intentionally distribute and possess with intent to distribute 50 grams or more of . . . 'crack cocaine'. . ." Additionally, Instruction 12, in keeping with *Apprendi*, told the jurors that, "if" they arrived at a guilty verdict, they "then" had to determine the quantity of drugs involved in the conspiracy. Verdict and special verdict forms reiterated these points.

In their deliberations, the jurors found each defendant guilty of the charged conspiracy and further determined that the conspiracy was responsible for 50 grams or more of crack cocaine. Thereafter, the district court sentenced Tolliver and Dunklin to 240 and 360 months of imprisonment, respectively. The defendants appeal.

## II.

In this appeal, we confront three independent issues. First, Dunklin challenges the admission of the audiotapes that recorded two of his conversations with a confidential informant. Second, Tolliver contests the government's inquiry into his 1991 drug sale to undercover police officers, his corresponding conviction, and related matters. Finally, the defendants argue that portions of the jury instructions referencing the indictment and drug quantity confused the jury and led to erroneous convictions. We address each issue in turn.

---

[1] *Apprendi v. New Jersey*, 530 U.S. 466, 476, 490 (2000).

**A.**

We begin with Dunklin's challenge to the audiotapes that recounted Dunklin selling crack cocaine to the confidential informant, Shye. Dunklin concedes that this evidentiary matter was not properly preserved and that, as a consequence, our review is limited to plain error. *See United States v. Hodges*, 315 F.3d 794, 800 (7th Cir. 2003). "Under the plain error standard, we will not reverse a decision unless the defendant demonstrates that (1) there was error; (2) the error was plain; and (3) the error affected the defendant's substantial rights. If the defendant meets these three requirements, we may correct the error if in our discretion, we find the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Trennell*, 290 F.3d 881, 887 (7th Cir. 2002) (quotations and citations omitted).

Relying exclusively upon *Crawford v. Washington*, 541 U.S. 36 (2004), Dunklin argues for a new trial, contending that the admission of the tapes violated his constitutional right "to be confronted with the witnesses against him." U.S. Const. amend. VI. *Crawford* addressed the admission of testimonial hearsay in criminal trials, holding that the Sixth Amendment's Confrontation Clause bars the admission of such testimonial statements unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. at 68; *see also United States v. Kelley*, 446 F.3d 688, 691 & n.2 (7th Cir. 2006); *United States v. Price*, 418 F.3d 771, 780 (7th Cir. 2005). While *Crawford* did not firmly define the word "testimonial" for every situation, *see* 541 U.S. at 68, examples and other guidance from the Supreme Court indicate that the term pertains to statements that a declarant makes in anticipation of or with an eye toward a criminal prosecution. *See Davis v. Washington*, 126

S. Ct. 2266, 2273, 2276, 2279 (2006); *United States v. Gilbertson*, 435 F.3d 790, 795-96 (7th Cir. 2006) (collecting authorities).

There are two declarants at issue here. The first is Dunklin himself. His statements on the tapes constitute admissions by a party-opponent, and, as such, those statements are, by definition, not hearsay under Federal Rule of Evidence 801(d)(2)(A). *See United States v. Spiller*, 261 F.3d 683, 690 (7th Cir. 2001). Consequently, since the prohibition annunciated in *Crawford* only applies to hearsay, that prohibition does not cover Dunklin's statements on the tapes. *See United States v. Jenkins*, 419 F.3d 614, 618 (7th Cir. 2005) (*Crawford* inapplicable to another form of non-hearsay under Rule 801(d)(2), co-conspirator statements under Rule 801(d)(2)(E)). Furthermore, Dunklin—the target of this sting operation who engaged in informal conversations with a customer, not known to him to be an informant—did not make his statements here with any expectation that they would be used against him in a criminal trial. If anything, as a purveyor of an illegal substance, Dunklin made these statements believing the exact opposite. Moreover, unlike a witness giving testimony, Dunklin was not recounting past events on these tapes but was rather making candid, real-time comments about drug transactions in progress. Therefore, besides not being hearsay, Dunklin's statements on the tapes are also not testimonial and thus fall outside of the *Crawford* rule against testimonial hearsay. *See Davis*, 126 S. Ct. at 2275 (statements made "unwittingly" to a government informant are "clearly nontestimonial" (citing *Bourjaily v. United States*, 483 U.S. 171, 181-84 (1987))); *id.* at 2276-77, 2278-79 (indicating that, among other distinguishing traits, statements recounting past events are testimonial whereas statements relaying present-tense happenings are generally nontestimonial); *United States v. Underwood*, 446

F.3d 1340, 1346-48 (11th Cir. 2006); *United States v. Hendricks*, 395 F.3d 173, 181, 183-84 (3d Cir. 2005); *United States v. Saget*, 377 F.3d 223, 229-30 (2d Cir. 2004).[2]

The other declarant in question is Shye. It is important to emphasize again that, aside from the testimonial versus nontestimonial issue, a crucial aspect of *Crawford* is that it only covers hearsay, i.e., out-of-court statements "offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801. Thus, to restate, *Crawford* only covers testimonial statements proffered to establish the truth of the matter asserted. *See Price*, 418 F.3d 780-81 (quoting and explaining *Crawford*, 541 U.S. at 59-60 n.9); *Hendricks*, 395 F.3d at 183. In this case, as pointed out by the government,

---

[2] *Crawford's* focus was testimonial hearsay. As for treatment of nontestimonial hearsay under the Confrontation Clause, *Crawford* left the issue unresolved, stating: "Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does *[Ohio v.] Roberts* [448 U.S. 56 (1980)], and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether." 541 U.S. at 68; *see also id.* at 61; *United States v. Danford*, 435 F.3d 682, 687 (7th Cir. 2005); *United States v. Dumeisi*, 424 F.3d 566, 576 (7th Cir. 2005); *Saget*, 377 F.3d at 227. However, the Supreme Court's recent decision on the matter, *Davis v. Washington*, appears to have resolved the issue, holding that nontestimonial hearsay is not subject to the Confrontation Clause. 126 S. Ct. at 2273, 2274-76, 2277-78. Even so, we need not pursue Dunklin's constitutional challenge beyond the *Crawford* framework because Dunklin has not argued that, even if the statements at issue are deemed nontestimonial, they still violate the Confrontation Clause. In other words, there is no dispute here that, if the statements are held nontestimonial, they do not run afoul of the Confrontation Clause.

Shye's statements were admissible to put Dunklin's admissions on the tapes into context, making the admissions intelligible for the jury.[3] Statements providing context for other admissible statements are not hearsay because they are not offered for their truth. *See United States v. Gajo*, 290 F.3d 922, 930 (7th Cir. 2002); *United States v. Plescia*, 48 F.3d 1452, 1463 (7th Cir. 1995). As a result, the admission of such context evidence does not offend the Confrontation Clause because the declarant is not a witness against the accused. *See Crawford*, 541 U.S. at 51, 59-60 n.9; *United States v. Davis*, 890 F.2d 1373, 1380 (7th Cir. 1989); *United States v. Hansen*, 434 F.3d 92, 100 & n.9 (1st Cir. 2006); *Hendricks*, 395 F.3d at 183. Therefore, as Shye's statements were readily admissible as this form of non-hearsay, not subject to the strictures of *Crawford* and the Confrontation Clause, Dunklin's argument here does not entitle him a reversal under the plain error standard.[4]

---

[3] Dunklin has not challenged the government's characterization of this evidence, nor has he given us any indication that the government used Shye's statements for any reason other than to place Dunklin's admissions into context. Further, before us, Dunklin has not explicitly contested the absence of limiting instruction on the use of this evidence. Such an instruction was not given at the time the evidence was introduced because Dunklin did not request one or otherwise raise an objection. Moreover, even after Dunklin brought his *Crawford* issue to the district court's attention (after the close of all evidence but before closing arguments), he still did not request any such limiting instruction. He is thus confined to plain error review. *See United States v. Breland*, 356 F.3d 787, 792 (7th Cir. 2004); *see also United States v. Walter*, 434 F.3d 30, 35 (1st Cir. 2006).

[4] In his brief, Dunklin also hints at an authentication argument,

(continued...)

**B.**

Next, we turn to the district court's decision allowing the government's inquiry into Tolliver's 1991 sale of drugs to undercover police officers and related matters. We review such evidentiary rulings only for an abuse of discretion. *See United States v. Zizzo*, 120 F.3d 1338, 1355 (7th Cir. 1997).

As highlighted above, Tolliver, in defending himself on the witness stand, tried to communicate two pivotal points to the jury. First, he cast himself as someone who was not a drug dealer, asserting he had no reason to sell drugs. Second, in a related but more specific vein, he denied working with Walls, the co-conspirator named in the indictment, to sell drugs. Critically, in the course of this direct testimony, Tolliver did not limit his statements to the period of the alleged conspiracy, i.e., 2002 to 2004. Rather, he denied *ever* selling drugs. For example, as mentioned above, Tolliver told the jury that he had "no reason to sell crack" because he had "worked *all [his] life*." At another juncture, he stated that it was "[n]ot my bag to

---

(…continued)

suggesting that the tapes could not be admitted through the testimony of Ellermeyer, the detective. Ellermeyer supervised each controlled purchase and its recording and further re-viewed each recording one-on-one with Shye. The record shows that, before the admission of each tape, Ellermeyer testified that each tape was a true and accurate recording of each conversation and also that he was familiar with Shye's and Dunklin's voices. As such, the government adequately authenti-cated each tape. *See United States v. Westmoreland,* 312 F.3d 302, 310-11 (7th Cir. 2002); *United States v. Degaglia*, 913 F.2d 372, 375-76 (7th Cir. 1990); Fed. R. Evid. 901(a) & (b)(5).

sell no [sic] drugs." He also testified that he did not "consider" himself to be "in that class of people" "who sell or deal or conspire to sell and deal in crack cocaine." Similarly, with respect to Walls, Tolliver was asked: "Have you *ever* conducted *any* drug business with Mr. Walls?" Tolliver replied: "No, sir. . . . No business, no sales." Through his testimony, therefore, Tolliver sought his acquittal by placing before the jury the notion that he had *never* been a drug dealer, with Walls or otherwise.

Such a strategy was not without risk. By becoming a witness, Tolliver exposed himself to cross-examination and the possibility that his testimony would be impeached. *See United States v. Gaertner*, 705 F.2d 210, 216 (7th Cir. 1983). After Tolliver laid his blanket denials of *ever* having trafficked in drugs before the jury, the government was entitled to test the accuracy of that evidence. *See Zizzo*, 120 F.3d at 1355; *Gaertner*, 705 F.2d at 216. In other words, by casting himself as something other than a drug dealer, who additionally had never done business with Walls, Tolliver "opened the door" for the government to impeach that testimony. This enabled the government to extract evidence about Tolliver's prior drug dealing, including his 1991 sale of crack-cocaine-laced marijuana cigarettes to undercover police officers. His related comments describing his relationship with Walls were also exposed. *See Zizzo*, 120 F.3d at 1355; *Gaertner*, 705 F.2d at 216; *see also Gilbertson*, 435 F.3d at 797 ("[W]hen a party opens the door to evidence that would be otherwise inadmissible, that party cannot complain on appeal about the admission of that evidence." (citation omitted)). Therefore, given certain sweeping denials within Tolliver's direct testimony, the district court did not abuse its discretion in permitting the government to impeach that testimony and allowing the jury to hear both sides of the story.

**C.**

The defendants also contest portions of the jury instructions. They concede that they did not object to the instructions as given; as a result, we review only for plain error. *See United States v. Jones*, 418 F.3d 726, 729 (7th Cir. 2005). We have two arguments to address here.

First, Tolliver and Dunklin contend that interplay between the instructions and indictment with respect to drug quantity caused confusion that resulted in an unfair trial. Three instructions are at issue. The district court's Instruction 6 introduced the indictment to the jury. It directly tracked the text of the pertinent pattern instruction. *See* Seventh Circuit Pattern Criminal Jury Instructions 2.01 (1999).

Instruction 11 explained the elements of the crime. As discussed at oral argument, Instruction 11 is a modified version of our Pattern Instruction 5.08. However, the district court's modifications do not materially affect the drug quantity issue before the court. In relevant part, Pattern Instruction 5.08 states: "To sustain the charge of conspiracy, the government must prove: First, that the conspiracy as charged in Count __ existed . . . ." Seventh Circuit Pattern Criminal Jury Instructions 5.08 (1999). Similarly, Instruction 11 stated: "To sustain the charge of conspiracy against a defendant, the government must prove these elements beyond a reasonable doubt as to that defendant: First, that the conspiracy as charged in the Superseding Indictment existed . . . ."[5] In this case, the phrase "conspiracy as

---

[5] The district court made several additions to the pattern instruction, accenting and clarifying certain conspiracy law

(continued...)

charged" meant, according to the indictment, a conspiracy to "distribute and possess with intent to distribute 50 grams or more of . . . 'crack cocaine'. . . . "

Instruction 12 began by stating: "If you find a defendant guilty of the conspiracy charged in the Superseding Indictment, then you must complete the Special Verdict Form pertaining to that defendant to determine the quantity of drugs involved in the charged conspiracy. If you find a defendant not guilty, leave the Special Verdict Form pertaining to that defendant blank." The instruction then meticulously explained the special verdict forms to the jury, tracking the applicable quantity distinctions laid out in § 841(b)(1) (i.e., 50 grams or more, 5 grams or more, less than 5 grams). The discussion of drug quantity in the indictment and in Instruction 12 is a direct result of the structure of § 841(b)(1) and *Apprendi*, which held "that facts (other than a prior conviction) that raise a defendant's sentence above the statutory maximum for the crime of conviction must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *United States v. Dumes*, 313 F.3d 372, 384-85 (7th Cir. 2002). We have, furthermore, previously approved the general framework employed here by the district court.[6] *See, e.g.*, *United States v. Macedo*, 406 F.3d 778, 785-86 & n.7 (7th Cir. 2005); *United*

---

(...continued)

nuances for the jury. These additions were mostly taken from the suggestions made in Committee Comment (b) that follows Pattern Instruction 5.08.

[6] Instruction 12 does not have an equivalent pattern instruction at the current time, as our present pattern instructions (issued in 1998 and published in 1999) have not been reissued since *Apprendi* (decided in 2000).

*States v. Knight*, 342 F.3d 697, 709-12 (7th Cir. 2003); *United States v. Smith*, 308 F.3d 726, 740-42 (7th Cir. 2002).

Nevertheless, Tolliver and Dunklin lament *Apprendi's* impact on their jury instructions. Most disconcerting to the defendants is the fact that the instructions used the phrase "the conspiracy as charged in the Superseding Indictment." They maintain that, because the instructions, particularly Instruction 11, cross-referenced the indictment and because the indictment mentioned a drug quantity, the instructions confused and misled the jury into prematurely making a quantity determination—i.e., deciding guilt and quantity simultaneously—and giving the quantity inquiry short shrift. In the defendants' words: "The only way the jury can place 'guilty' on the verdict form is to determine the conspiracy existed in the Superseding Indictment which necessitates a determination that [a defendant] agreed to more than 50 grams of crack."

Of course, if that were true, it would cut both ways. If the jury combined the conspiracy and quantity determinations into one, the jury would then erroneously acquit the defendants of conspiracy if the jury believed that less than 50 grams were at issue. However, the defendants' contention is not true. Jury instructions must be viewed as a whole, *see Knight*, 342 F.3d at 709, and, as a whole, these instructions are neither confusing nor misleading. The key is the "if-then" combination in the first two sentences of Instruction 12. Any potential for confusion along the lines alleged by the defendants was dispelled by those two sentences which are quoted above. The first sentence, to summarize, told the jurors: "if" you find that a conspiracy existed, "then" determine the quantity of crack cocaine at issue by using the special verdict forms; the second sentence instructed: "if" you alternatively determine that a conspiracy

did not exist, then leave the special verdict forms blank because a drug quantity determination is unnecessary. The special verdict forms also helped negate any potential for confusion. These forms restated the contingent nature of the drug quantity inquiry, directing the jurors to answer the special verdict questions only "if" they first found the defendants guilty of conspiracy. Consequently, the instructions, along with the special verdict forms, made the jurors aware that, upon entering the jury room, they had to confront two separate and sequential inquiries, first conspiracy and then, only if necessary, quantity. Further, as to the defendants' underlying concern, the carefully worded text of Instruction 12 and the special verdict forms afforded the jury a genuine opportunity, upon a conspiracy conviction, to find that the conspiracy was responsible for less than 50 grams of crack cocaine. Viewing the instructions as whole, therefore, we conclude that the instructions treated the relevant issues fairly and accurately. *See United States v. Alhalabi*, 443 F.3d 605, 612 (7th Cir. 2006); *Knight*, 342 F.3d at 709. We thus find no error here, let alone a plain one.

Second, Tolliver claims that, in terms of drug quantity, the jury instructions denied him his right to a unanimous verdict. He speculates that, given the large number of transactions that the government put into evidence, individual jurors may have reached the jury's 50-gram-or-more finding via different routes. According to Tolliver, therefore, Instruction 12 and the attendant language on his special verdict form directing the jury to agree unanimously upon a drug quantity range (e.g., 50 grams or more, 5 grams or more) was insufficient. Instead, Tolliver believes that the district court should have instructed the jurors to reach unanimity upon the transactions and even the specific pieces of crack cocaine for which they believed he was individually responsible. However, "[d]rug quantity is not

an element of a § 841 drug offense," and, in the context of quantity determinations, the law only requires that the jury reach unanimous agreement upon a drug range, not upon specific amounts, transactions, or morsels. *Smith*, 308 F.3d at 740-42 ("We do not believe that, under *Apprendi*, the district court was required to take the additional step of asking the jury to return a specific finding of drug amount, which would ostensibly reflect the jury's agreement on the occurrence of specific drug transactions."); *see also Macedo*, 406 F.3d at 786-87. Additionally, in the conspiracy context, the jury need not make a defendant-specific quantity determination. *See Knight*, 342 F.3d at 710-12 ("*Apprendi* [does] not require defendant- specific findings of drug type and quantity to a conspiracy charge. . . . Once the jury determines the existence of the conspiracy, the defendants' participation in it, and assigns a type and quantity attributable to the conspiracy as a whole, it has established the statutory maximum sentence that any one participant in that conspiracy may receive."); *see also United States v. McGee*, 408 F.3d 966, 986 n.4 (7th Cir. 2005). Accordingly, there is no error in these instructions, plain or otherwise.

**III.**

In sum, the defendants have not presented us with a reversible error in this case. The admission of audiotapes of Dunklin's candid conversations with Shye, the confidential informant, did not run afoul of the Confrontation Clause. Further, Tolliver's broad-brush denials of ever having sold drugs, with or without Walls, the named co-conspirator, opened the door for the government to impeach that testimony by raising Tolliver's 1991 drug sale to undercover police officers and related matters. Finally, when read as a whole, the jury instructions address the necessary references

to the indictment and drug quantity fairly and accurately. Accordingly, the judgment of the district court in each defendant's case is AFFIRMED.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*