


FILED

Jun 23 2026, 8:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

Lydia Theresa Conley,

*Appellant-Petitioner*

v.

State of Indiana,

*Appellee-Respondent*

June 23, 2026

Court of Appeals Case No.
25A-PC-2706

Appeal from the Lake Superior Court

The Honorable Kathleen A. Sullivan, Magistrate

Trial Court Cause No.
45G03-2406-PC-11

**Opinion by Judge Mathias**
Judges Kenworthy and DeBoer concur.

**Mathias, Judge.**

[1] Lydia Conley appeals the post-conviction court's denial of her petition for post-conviction relief. Conley raises three issues for our review, which we restate as follows:

> 1. Whether her trial counsel performed reasonably when he failed to object to a witness's testimony that Conley had told the victim that Conley was going to shoot the victim sometime before the victim was found shot to death.

> 2. Whether her trial counsel performed reasonably when he did not object to certain surveillance videos and did not proffer a supplemental reasonable-theory-of-innocence jury instruction.

> 3. Whether the post-conviction court erred when it denied Conley's petition.

[2] We agree with Conley that her trial counsel's failure to object to the witness's testimony was unreasonable, and, had he lodged a hearsay objection to that testimony, the trial court would have been required to sustain the objection. However, we conclude that Conley has not met her burden to show that her trial counsel acted unreasonably with respect to the surveillance videos and the supplemental jury instruction, and we conclude that her counsel's failure to object to the witness's testimony is, on this record, insufficient to show that the post-conviction court erred when it denied her petition.

## Facts and Procedural History

[3] In 2018, Conley began dating Delilah Martinez, and, in the summer of 2019, Conley and her daughter (Felicia) moved into Martinez's Hammond[1] residence with Martinez's children (including her daughter, Desha, who was around eighteen years old). Conley and Martinez's relationship was described as "toxic" early on, and it only "got worse" over time. Trial Tr. Vol. 3, p. 174. Among other problems, Conley was also in a romantic relationship with Madeline Mendoza, a relationship that Conley had been in since 2005.

[4] In October 2019, Martinez learned of Conley's relationship with Mendoza, and Martinez ended her relationship with Conley. Around the same time, Mendoza learned about Martinez, and Mendoza also ended her relationship with Conley. Conley "moved out" of Martinez's home (although Felicia did not), and Martinez quickly "move[d] on." *Id.* at 178. In particular, around the time of her breakup with Conley, Martinez began dating Lucas Xavier Mercado. Mercado was married at the time, and, when his wife learned of the affair sometime later, she was "not happy." Trial Tr. Vol. 4, p. 41.

[5] Between October 24 and October 26, 2019, Conley sent Martinez a slew of text messages that, when read aloud, cover thirteen pages of the trial transcript.[2] *See* Trial Tr. Vol. 5, pp. 195-208. Among other things, Conley repeatedly asked if

---

[1] Although legally in Hammond, Martinez's residence had a Whiting address.

[2] This does not include messages Conley sent to Martinez through apps.

Martinez was "with someone," and, if so, whether that person was "a girl." *Id.* at 196. Conley also repeatedly lamented the loss of the relationship and a desire to reconcile. At one point, Martinez responded and told Conley, "[i]f you don't stop [I'm going to] block you." *Id.* at 201. Conley replied, "[b]lock me because I'm broken[?]" *Id.* at 202.

[6] By the early evening hours of October 26, Martinez had had her fill of the text messages and told Conley, "I'm on my way to make a police report . . . ." *Id.* at 205. Conley's text messages turned more aggressive after that, with Conley saying, among other things: "F*ck you, . . . I don't care what you do"; "I don't want no men around my daughter"; and, at 10:07 p.m. on October 26, "I'm sleeping. I have to work. Attend to your little boy." *Id.* at 205-07.

[7] But Conley did not go to sleep and, instead, texted Martinez again shortly before midnight, asking Martinez to "call" and then accusing Martinez of being "with him," an apparent reference to Mercado. *Id.* at 208. And, at 2:26 a.m. on October 27, Conley texted Martinez: "Check your message on Facebook, clown." *Id.* Just a few minutes before that text, Conley had said to Martinez on Facebook: "Damn . . . you move so fast with a kid who could date your daughter, but it's cool. Enjoy yourself in life. I'm out. . . . Don't call me when that [racial slur] cheating on you." Trial Tr. Vol. 6, p. 10.

[8] Meanwhile, Desha was dating Jose Echabarria.[3] Unfortunately, Desha suspected Jose of "cheating," and Desha told Martinez of her suspicion. Trial Tr. Vol. 3, p. 181. In the evening hours of October 25, Martinez and Mercado accompanied Desha to a party where they expected to find Jose, but Jose was not there. Upon arriving at the party, Mercado "grabbed a brick and threw it through the window." *Id.* at 182. They then left and went to Jose's house; Jose was there with several family members and other acquaintances. Mercado "got out [of] the car" and "punched [Jose] in the face." *Id.* at 183. When an older family member stepped in, Mercado punched him too. They then left Jose's house and went back to Martinez's house.

[9] Not long after, Jose messaged Desha about Mercado. Jose was "upset" and "wanted to confront" Mercado. *Id.* at 184-85. Desha said she "did not" know who Mercado was and had only just met him through her mother. *Id.* at 184. Sometime on October 26, Jose told Desha that he gave Desha's address (Martinez's residence) to one of his brothers. *Id.* at 246. But Jose considered Martinez like "a mother" to him, and he was clear that he was not "upset" with Martinez and did not "blame[ her] at all" for Mercado's behavior. *Id.* at 185-86.

[10] October 26 was also the day that Conley's text messages with Martinez turned more aggressive. That day, Conley moved Felicia out of Martinez's residence using Conley's 2011 brown Buick sedan. Around 7:38 that evening, Conley

---

[3] When he spelled his own name at trial, Jose did not specify the use of any accent marks. *See* Trial Tr. Vol. 5, pp. 78-79.

asked Monica Graham,[4] Conley's now-sister-in-law who lives in Chicago, if Conley could borrow Graham's 2013 gray Chevy Malibu for a few hours. Graham had never previously lent her car to Conley, and Graham informed Conley that the Malibu had tire-pressure issues and might be out of oil. But Conley insisted on needing to use the Malibu despite the issues, and so Graham relented.

[11] The evening of October 26, Martinez was supposed to go to a Halloween party with Vanessa Vera, a friend from work. Vera took her children to Martinez's residence for Desha to babysit them, but Martinez was not there. Vera spoke with Martinez on the phone sometime "between six or seven" that evening; Martinez said she had "bumped into [Conley]" at some unspecified point earlier that day and the two had "interchanged some words." Trial Tr. Vol. 4, pp. 28-29. Vera then went out without Martinez.

[12] Sometime between 10:00 and 10:40 that night, Martinez called Vera. *See id.* at 29-31. Martinez said she had decided to not go out because she did not "feel good," did not "feel right," and was "scared for [her] life to be honest . . . ." *Id.* at 29. Vera followed up with Martinez on Snapchat and asked Martinez if she was "okay" and if Vera "need[ed] to leave" the party. *Id.* at 30. Martinez responded by saying that Conley "had threatened to shoot her and the guy she

---

[4] In 2019, Graham's last name was Jones, and the record alternates between referring to her as Graham and as Jones. We follow the name she gave for herself at trial.

was seeing [Mercado] . . . ." *Id.* at 31. But Martinez told Vera that Vera did not need to leave, and Martinez was "just going to stay home . . . ." *Id.* at 30.

[13] Around 3:00 a.m. on October 27, Desha and Martinez's neighbor awoke to gunshots being fired. Both immediately called 9-1-1. Desha saw a four-door sedan darker than Conley's Buick leaving the residence and her mother lying on the ground outside the residence. Martinez had been shot several times. Responding paramedics transported her to a nearby hospital, where she later died from her wounds.

[14] Desha informed officers that either Conley or someone in Jose's family might have been the shooter. At the hospital with Martinez, Desha sent several text messages to Conley about the shooting; at one point, Conley responded: "They can come check my car . . . . I was nowhere near [Martinez]" at the time of the shooting. Trial Tr. Vol. 3, p. 211. In a later conversation with Hammond Police Department Detective Brian Webber, Conley "offered [the] OnStar records for [the location of] her vehicle," the Buick, but Conley "never" informed Detective Webber that she had borrowed Graham's Malibu on the night in question. Trial Tr. Vol. 5, p. 246.

[15] The investigation into Martinez's murder lasted several months. Officers investigated Jose and his family, Mendoza, Mercado, and Mercado's wife. To varying degrees, they all cooperated with the investigation, and officers eventually excluded each of them as a possible suspect. *See id.* at 84-85 (Jose cooperated); *id.* at 175-77 (Mercado excluded); *id.* at 223 (Mendoza excluded);

Trial Tr. Vol. 6, pp. 41-44 (Mercado's wife excluded); *id.* at 45-49 (Jose's family excluded).

[16] The course of the investigation led officers to identify Graham's vehicle as the vehicle used in the perpetration of the murder. Among other data, a Hammond license plate reader had recorded Graham's Malibu traveling near Martinez's residence at a time proximate to the shooting. Further, two surveillance videos, one from an alley near Martinez's residence and one from a nearby gas station, showed a vehicle resembling Graham's Malibu near Martinez's residence around the time of the 9-1-1 calls (we will refer to these two particular videos as "the surveillance videos"). Those recordings led officers to Graham, and Graham showed officers her messages with Conley in which Graham had allowed Conley to borrow the Malibu on the night in question. Based on this and other information, officers excluded Graham as a suspect. Trial Tr. Vol. 6, p. 41.

[17] Thus, the investigation came to a focus on Conley. Officers learned that Conley had obtained a new cell phone and a new cell-phone number on October 31, 2019, shortly after Martinez's murder. She also set up a new Google account on November 1. Officers never recovered Conley's prior cell phone.

[18] However, through mobile carriers, officers were able to obtain the historical cell-site location information for Conley's prior cell phone. That information showed that Conley's prior cell phone connected with a cell tower near Graham's residence on the evening of October 26 and then moved to a cell

tower that covered Martinez's residence at the time of the murder. Conley's prior cell phone then connected with towers moving away from Martinez's residence in a timeframe consistent with the post-shooting 9-1-1 calls. And the movements of Conley's prior cell phone matched the license-plate reader and the two surveillance-video recordings of Graham's Malibu.

[19] Further, upon learning of Conley's new Google account, officers were able to obtain her internet history. In particular, on November 1, 2019, Conley visited internet sites titled, "How to prevent police from tracking my phone," and "What your cell phone can't tell the police." *Id.* at 71-72. From November 2019 through January 2020, Conley searched several terms relating to police investigations using cell-tower information, probable cause, out-of-state arrest warrants, Indiana criminal statutes of limitation (there is no statute of limitation in Indiana for murder, *see* Ind. Code § 35-41-4-2(d) (2019)), and how to tell if your cell phone is being tracked. Conley also downloaded a document titled "The Law of Homicide" along with the Indiana Rules of Evidence. Trial Tr. Vol. 6, p. 83. And, about thirty-four hours before Martinez's murder, Conley asked a friend on Facebook to "[l]ook out for Felicia if anything happens to me." *Id.* at 21.

[20] On June 12, 2020, the State charged Conley with Martinez's murder. The State later amended its information to include a firearm enhancement. At the commencement of the initial phase of her jury trial, Conley's trial counsel did not dispute that Conley had hurt feelings over her breakup with Martinez. *See* Trial Tr. Vol. 3, pp. 69-70. But, Conley's counsel continued, there were

multiple suspects who may have wanted to kill Martinez, and he emphasized that Conley's defense would be to attack the quality of the State's investigations into those other suspects. *See id.* at 67.

[21] The State presented substantial evidence to the jury of Conley's guilt. The State's evidence included Conley's motive for the killing, as evidenced by her many messages to Martinez leading up to the murder; Conley's next-morning assertion that her car's location information would prove her innocence along with Conley's corresponding use of Graham's car and not informing officers of her use of Graham's car; the location information of Conley's prior cell phone and the alignment of that information with the license-plate reader and the surveillance videos of Graham's car; Conley's apparent disposal of the prior cell phone and acquisition of a new cell phone and a new Google account shortly after the murder; and Conley's internet history following the murder. The State also explained how it had investigated numerous other suspects and why it had eventually excluded all of them. During the State's case-in-chief, Conley's trial counsel stipulated to the admission of the surveillance videos, which relieved the State of its burden of having to establish a foundation for the admission of that evidence.

[22] Also during the State's case-in-chief, Vera testified about the night of Martinez's death, without objection, as follows:

> I said, "Are you okay?"

She said, "Yeah, I'm fine," she said, "but I'm just not going to go out. I'm just going to stay right here with your kids," . . . .

* * *

Q [by the State:] Did she tell you about any threats she received?

A       So right after I hung up on her when I told her like "I'll just text you," [and] *she told me that her ex-girlfriend [Conley] had threatened to shoot her and the guy that she was seeing*, and I somewhat remember telling her like "Don't listen to her. Like, she's probably just in her feelings," and then I think we just left it at that from what I recall, and like I mentioned, the last thing that I got from her was a video of her on Snapchat and my son playing together.

Trial Tr. Vol. 4, pp. 29, 31 (emphasis added). Conley's counsel then cross-examined Vera on why she no longer had the messages with Martinez and had to recall them from memory. On redirect, the State then asked Vera the following, again without objection:

Q       Okay. And you testified earlier that you received a Snapchat from Delilah about the defendant threatening to kill her, shoot her—

A       Yes.

Q       —the day before she was murdered.

A       Yes, she added that in there.

Q       You didn't feel the need to screenshot that message?

A      No.

Q      Why not?

A      Because I never thought it would happen. I just thought her ex-girlfriend was just in her feelings, like I want to say like any other ex maybe.

*Id.* at 47.

[23]   During closing argument, the State recounted its case against Conley. That included, without objection, Vera's testimony that Martinez had told Vera, on the night of the shooting, that Conley had threatened to shoot Martinez and Mercado. *See* Trial Tr. Vol. 6, pp. 219-20. Conley's counsel, in turn, emphasized all the other suspects who might have wanted to kill Martinez or Mercardo and the need for the State to prove its case against Conley beyond a reasonable doubt. In rebuttal, the State began, again without objection: "The defendant said she was going to shoot [Martinez], and she did shoot [Martinez]." *Id.* at 240-41. The rest of the State's rebuttal then exhaustively recapped the State's evidence in support of the murder charge.

[24]   The jury found Conley guilty of Martinez's murder. Conley then waived her right to a jury trial on the firearm enhancement, and the trial court found her guilty of using a firearm in the commission of Martinez's murder. The court then sentenced Conley to a total term of seventy years. On direct appeal, we affirmed her conviction after she argued that the trial court erred when it

excluded certain evidence pertaining to Mendoza. *Conley v. State*, No. 22A-CR-1748, 2023 WL 3580862 (Ind. Ct. App. May 22, 2023) (mem.), *trans. denied*.

[25] Thereafter, Conley filed her petition for post-conviction relief, which she later amended. In her amended petition, Conley alleged that she had received ineffective assistance of trial counsel for three reasons: (1) he failed to object to Vera's testimony that Conley had told Martinez that Conley was going to shoot her sometime before Martinez was shot to death; (2) he failed to challenge the evidentiary foundation for the surveillance videos; and (3) he failed to tender a "reasonable theory of innocence" jury instruction. Appellant's App. Vol. 2, p. 43.

[26] At an ensuing evidentiary hearing, Conley's trial counsel testified that he did not recall Vera's testimony or why he would not have objected to it. Tr. Vol. 2, pp. 41-42. He similarly testified that he had no recollection of the surveillance videos at issue or why he had stipulated to their admission specifically. However, he suggested that his typical practice for stipulations is to give them when he is satisfied that doing so would avoid needlessly having the State call more witnesses. *See id.* at 33. And, regarding the jury instruction, he testified that he believed his emphasis on the beyond-a-reasonable-doubt standard was covered by the instructions given.

[27] Following the evidentiary hearing, the post-conviction court concluded that, had Conley's trial counsel objected to Vera's testimony, the objection would have been overruled. The court also found that Conley's trial counsel simply

"save[d] time" by stipulating to the surveillance videos. Appellant's App. Vol. 2, p. 213. And the court agreed with Conley's trial counsel that Conley's post-conviction concerns about a "reasonable theory of innocence" instruction were meritless because the instructions given to the jury "incorporate[d] some of the same concepts . . . ." *Id.* at 216. Accordingly, the post-conviction court denied Conley's petition.

This appeal ensued.

## Standard of Review

Conley appeals the post-conviction court's denial of her petition for post-conviction relief. As our Supreme Court has explained:

> Post-conviction proceedings are civil proceedings in which the defendant must establish [her] claims by a preponderance of the evidence. Post-conviction proceedings do not offer a super-appeal[;] rather, subsequent collateral challenges to convictions must be based on grounds enumerated in the post-conviction rules. Those grounds are limited to issues that were not known at the time of the original trial or that were not available on direct appeal. Issues available but not raised on direct appeal are waived, while issues litigated adversely to the defendant are res judicata . . . .
>
> Because the defendant is appealing from the denial of post-conviction relief, [s]he is appealing from a negative judgment and bears the burden of proof. Thus, the defendant must establish that the evidence, as a whole, unmistakably and unerringly points to a conclusion contrary to the post-conviction court's decision. In other words, the defendant must convince this Court that there is no way within the law that the court below could

have reached the decision it did. We review the post-conviction court's factual findings for clear error[ ] but do not defer to its conclusions of law.

*Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013) (citation modified).

[30] Conley's post-conviction arguments are focused on allegations of ineffective assistance of trial counsel. To prevail on such claims:

> [The post-conviction petitioner] must show (1) that [her] counsel's performance fell short of prevailing professional norms, and (2) that counsel's deficient performance prejudiced [her] defense. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). A showing of deficient performance under the first of these two prongs requires proof that legal representation lacked an objective standard of reasonableness, effectively depriving the defendant of [her] Sixth Amendment right to counsel. To demonstrate prejudice, the defendant must show a reasonable probability that, but for counsel's errors, the [trial] would have resulted in a different outcome. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

> When assessing the counsel's performance, we rely on some basic guidelines. First, we start by strongly presuming that, throughout the proceedings, counsel exercised reasonable professional judgment and rendered adequate legal assistance. Second, defense counsel enjoys considerable discretion when developing legal strategies for a client, demanding deference during judicial review. Third, counsel's isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective.

*Wilson v. State*, 157 N.E.3d 1163, 1177 (Ind. 2020) (citation modified).

## 1. Trial counsel's failure to object to Vera's testimony was unreasonable.

[31] We first consider Conley's argument that her trial counsel rendered ineffective assistance when he failed to object to Vera's testimony regarding Martinez's statements to Vera prior to the murder.[5] To show ineffective assistance for counsel's failure to object, the post-conviction petitioner first "must prove that an objection would have been sustained if made . . . ." *Gibson v. State*, 133 N.E.3d 673, 692 (Ind. 2019). Here, there is no dispute between the parties that Vera's testimony contained hearsay. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted, Ind. Evidence Rule 801(c), and hearsay is presumptively inadmissible, *see* Evid. R. 802.

[32] However, our Evidence Rules allow for the admission of hearsay evidence under certain, limited exceptions. The only exception proffered by the State as a basis for admitting Vera's testimony is under Evidence Rule 803(3). That Rule provides in relevant part that the following out-of-court statements may be admissible:

> A statement of the declarant's then-existing state of mind (such as motive, design, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . .

---

[5] Given our holding under the hearsay rules, we need not consider Conley's additional arguments under other Evidence Rules or the trial court's orders on motions in limine.

Evid. R. 803(3).

[33] We initially note that the portion of Vera's testimony that might be captured by Rule 803(3) requires discernment. The parties on appeal treat Vera's recollection of Martinez's statements as either entirely captured by or entirely outside of Rule 803(3), but, on this record at least, we doubt that assumption. Vera's testimony about Martinez's October 26, 2019, statements consisted of two key parts. First, Vera testified that Martinez had said, in a phone call while Vera was at the Halloween party, that Martinez was not going out and was instead staying at home because Martinez did not "feel good" or "feel right" and Martinez was "scared for [her] life." Trial Tr. Vol. 4, p. 29. That part of Vera's testimony was hearsay that *might* have been admissible to prove the truth of the matters asserted under Rule 803(3)'s state-of-mind exception.

[34] But Vera's testimony went further than simply relaying Martinez's possible state of mind. Vera also testified as to *why* Martinez had that state of mind, testifying that, after that phone call, Martinez said in Snapchat messages that Conley "had threatened to shoot her" and Mercado. *Id.* at 31. Insofar as that additional testimony may have had admissible relevance, it would not have been for the truth of the matter asserted but instead to *explain* Martinez's state of mind. *See Williams v. State*, 930 N.E.2d 602, 609 (Ind. Ct. App. 2010) ("Statements providing context for other admissible statements are not hearsay because they are not offered for their truth.") (quoting *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006)), *trans. denied*. That is, Vera's testimony about the alleged threat is best viewed as not hearsay at all; its admissibility as

relevant evidence, however, would only have been possible if the purported state-of-mind evidence were admissible. *See id.* And, because Conley's trial counsel did not object to the hearsay component of Vera's testimony, he also did not request a limiting instruction regarding the proper—and improper—scope of the nonhearsay component of her testimony, nor did he request to exclude the nonhearsay component under Indiana Evidence Rule 403.

[35] This brings us to the parties' arguments on appeal. As our Supreme Court has explained:

> Rule 803(3) creates a hearsay exception for statements of the declarant's then-existing state of mind at the time the statement was made. State of mind, as that term is defined, may include emotion, sensation, physical condition, intent, plan, motive, design, mental feeling, pain, and bodily health.
>
> In criminal cases involving out-of-court statements of a victim's state of mind, this Court has identified three "instances where such statements may be admissible." *Ford v. State*, 704 N.E.2d 457, 459-60 (Ind. 1998). The first is to respond "when the defendant puts the victim's state of mind in issue." *Hatcher v. State*, 735 N.E.2d 1155, 1161 (Ind. 2000); *see, e.g.*, *Ford*, 704 N.E.2d at 459-60 (victim's statement to witness that "she was unhappy and that she wanted to leave but she was afraid that if she left [the defendant] again he would kill her" was admissible as indicative of her state of mind). . . . The second—"to explain physical injuries suffered by the victim," *Hatcher*, 735 N.E.2d at 1161—this Court applied in *Nicks v. State*, 598 N.E.2d 520, 525 (Ind. 1992), to admit remarks of a murder victim "to demonstrate the victim's explanation of prior injuries inflicted by the defendant." . . . The third is . . . "[t]o show the intent of the victim to act in a particular way." *Hatcher*, 735 N.E.2d at 1161.

*D.R.C. v. State*, 908 N.E.2d 215, 226 (Ind. 2009).

[36] Here, the post-conviction court appears to have concluded that Vera's testimony that "Martinez decided to stay home because she didn't feel right and had been threatened by [Conley]" was admissible under the third scenario described above, namely, to show Martinez's intent to act in a certain way. *See* Appellant's App. Vol. 2, p. 212. But the post-conviction court's analysis is overinclusive of both the hearsay and the nonhearsay components of Vera's testimony. That is, while the statement that "Martinez decided to stay home because she didn't feel right" might have been admissible under Rule 803(3), the nonhearsay explanation for why Martinez felt that way would not have been captured by the Rule.

[37] And a more nuanced analysis of Vera's testimony shows that no part of it was admissible under Rule 803(3). Rule 803(3) applies only to evidence of a declarant's "then-existing" state of mind—that is, the declarant's state of mind at a time reasonably contemporaneous with his or her statement. *See Hicks v. State*, 690 N.E.2d 215, 223 (Ind. 1997). Rule 803(3) does not apply to evidence of a state of mind that had been held by the declarant at some unknown time prior to the declarant's statement. *See id.*

[38] In *Hicks*, for example, the declarant told the witness that the declarant "was still upset with [the defendant]" based on a conversation that was, at the time the declarant spoke to the witness, four hours old. *Id.* Our Supreme Court held that the witness's testimony was not admissible under Rule 803(3) because "the gist"

of the declarant's statement to the witness was "about how upset [the declarant] felt at the time of her conversation with [the defendant], four hours before, and not of her 'then existing' state of mind . . . ." *Id.*

[39] So too here. Vera first spoke to Martinez sometime between 6:00 p.m. and 7:00 p.m. on October 26, 2019. In that conversation, Martinez told Vera that, at some unknown time earlier that day, Martinez had spoken to Conley, and the two had "interchanged some words." Trial Tr. Vol. 4, p. 29. Several hours after that first conversation with Vera, Martinez again spoke with Vera and told her that, based on the earlier conversation with Conley, Martinez was not going to go out because Martinez did not "feel good" or "feel right" and Martinez was "scared for [her] life." *Id.* That is, "the gist" of Martinez's second phone call with Vera was that Martinez was "still upset" from the prior conversation she had had with Conley. *Hicks*, 690 N.E.2d at 223. But there is no evidence in the trial record or in the post-conviction record as to when on October 26, 2019, the conversation between Martinez and Conley took place. There is also no dispute that the relationship between Martinez and Conley was "toxic." Trial Tr. Vol. 3, p. 174.

[40] Had Conley's trial counsel objected to the purported state-of-mind evidence as inadmissible hearsay, the State would have been required to make an affirmative showing that Martinez's statements to Vera were reasonably contemporaneous with Martinez's conversation with Conley. *See Hicks*, 690 N.E.2d at 223; *see also* 13 Robert Lowell Miller, Jr., Ind. Prac., Indiana Evidence § 803.103A (4th ed. Aug. 2025 update) (noting that, for a statement to

be admissible under Rule 803(3), it must, among other things, have been made at a time "reasonably contemporaneous with the mental state" such that the declarant "had no time to reflect, that is, no time to fabricate or misrepresent" her state of mind). But we have been presented with no reason to conclude that the State could have made such a showing. There is no evidence that Martinez's statements to Vera in the initial phone call, between 6:00 p.m. and 7:00 p.m., were reasonably contemporaneous with Martinez's conversation with Conley; that is only all the more true for Martinez's statements to Vera in the second phone call several hours later. Thus, the alleged state-of-mind evidence was not admissible under Rule 803(3), and a hearsay objection against Vera's hearsay testimony would have been sustained. And, as the hearsay component of Vera's testimony was inadmissible, Martinez's still-later Snapchat messages to Vera regarding the alleged threat from Conley had no relevance and were also inadmissible.

[41] Even if we were to conclude that Martinez's Snapchat messages to Vera about Conley's alleged threat carried some contemporaneous and implied state-of-mind evidence with it, as the post-conviction court appears to have concluded, the statement regarding the alleged threat was still inadmissible under Rule 803(3). And on this point our case law is clear. In *D.R.C.*, the State charged the defendant with murdering his wife. At trial, one of the wife's friends testified that, on the day of the murder, the wife had said that she "was expecting her husband home between 7:00 and 7:30" that evening. *D.R.C.*, 908 N.E.2d at 225. The witness's testimony, admitted over the defendant's hearsay objection,

placed the defendant at the time and place of the murder and undermined his alibi defense. On appeal, the State argued that the witness's testimony was admissible under Rule 803(3) to show why the wife was "at home at 7:30 p.m." *Id.* at 228. That is, the State argued that the witness's testimony carried, by implication, a representation of the declarant's state of mind.

Our Supreme Court rejected the State's argument and held that Rule 803(3) may be used to admit statements that "prove or explain acts or conduct of *the declarant*," but the Rule is not an end-around "to prove *a third-party's* conduct." *Id.* (emphases added). As our Supreme Court cautioned, the declarant in such situations cannot know the defendant's or another third-party's intent "without perceiving and remembering some past fact," *i.e.*, something the third party "said or did" to express that intent to the declarant. *Id.* at 227. The declarant's relaying of that past fact to a person who later becomes a witness "is thus no more reliable than any other classic form of hearsay, and this unreliability erodes the basis for admitting state-of-mind declarations in the first place." *Id.*

In such a scenario, our Supreme Court continued, the declarant is not stating his or her own state of mind but instead is providing a "statement of memory or belief," which is then improperly offered by a witness "to prove the fact believed . . . ." *Id.* (quoting *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980) ("[T]he state-of-mind exception does not permit the witness to relate any of the declarant's statements as to *why* [the declarant] held the particular state of mind, or what [the declarant] might have believed that would have induced the state of mind.") (emphasis added; first alteration original to *D.R.C.*)). And our

Supreme Court concluded that, because its reasoning "compels excluding explicit references" to a third party's conduct, its reasoning "applies even more forcefully to implication," such as the implied state-of-mind the State sought to invoke through the *D.R.C.* witness's testimony. *Id.*

[44] Vera's testimony regarding what Martinez had said about Conley's alleged threat is the type of third-party reference our Supreme Court disapproved of in *D.R.C.* Martinez's recollection to Vera necessarily turned on Martinez's memory or belief of the fact remembered—the alleged threat by Conley at some unknown time earlier that day. And such testimony is excluded by both Rule 803(3)'s plain terms and by our Supreme Court's reasoning in *D.R.C.* Thus, the post-conviction court's analysis on this issue is contrary to law.

[45] Still, the State argues that Vera's testimony was admissible because the relationship between Conley and Martinez was at issue. The State's assessment appears to be a reference to our Supreme Court's statement that hearsay may be admissible under Rule 803(3) "when the defendant puts the victim's state of mind in issue." *Id.* at 226 (quotation marks omitted). But the State conflates the whole of the relationship between Conley and Martinez with Martinez's specific state of mind on a specific occasion, which are not equivalent propositions. Rule 803(3) does not permit all out-of-court statements relating to a defendant's relationship to a victim. *Cf. Willey v. State*, 712 N.E.2d 434, 443 (Ind. 1999) ("Motive and intent of the defendant are potentially relevant to the admissibility of prior 'bad acts' under Evidence Rule 404(b), but [they] do not constitute an exception to the hearsay rule."). Further, it was the State's case

that put Conley's relationship with Martinez at issue; Conley's defense was that the State failed to properly investigate other suspects. The State's argument here is without merit.

[46] The State also asserts that Conley's trial counsel acted with a reasonable strategy in not objecting to Vera's testimony because it allowed the jury to hear that Vera thought Conley was "just in her feelings" about the break-up. Appellee's Br. at 35 (quoting Trial Tr. Vol. 4, p. 47). The State's strategy theory is not supported by the testimony of Conley's trial counsel to the post-conviction court, who could not recall a reason for not objecting to Vera's testimony. And even if the State's supposed theory could be called a strategy, it was not a reasonable one. That Conley was an upset former partner of Martinez was not disputed; meanwhile, in exchange for that unneeded evidence, the State suggests that a reasonable attorney would let the jury hear the otherwise-inadmissible testimony from Vera that Conley had threatened to shoot Martinez sometime before Martinez was shot to death. No reasonable defense counsel would have made the choice the State proposes here, and we reject it.

[47] We therefore conclude that the post-conviction court's assessment that Conley's trial counsel acted reasonably in not objecting to Vera's testimony is contrary to law.

## 2. Conley's trial counsel acted reasonably in stipulating to the admissibility of the surveillance videos and in not seeking a supplemental jury instruction.

[48] Before turning to the second step of the *Strickland* analysis, we briefly consider Conley's two additional arguments of ineffective assistance from her trial counsel. First, Conley asserts that her trial counsel acted unreasonably when he stipulated to the admission of the surveillance videos. Because the State had not listed on its witness list people who could establish a proper foundation for those videos, had her trial counsel objected, Conley continues, the surveillance videos would not have been admissible.

[49] The post-conviction court found that the stipulations by Conley's trial counsel here simply "save[d] time." Appellant's App. Vol. 2, p. 213. That finding is supported by the testimony of Conley's counsel, in which he suggested that his usual practice is to stipulate to evidence when he is satisfied that the State would be able to establish a proper foundation for the evidence. And the implication from that testimony is that, had Conley's trial counsel informed the State that he was not going to stipulate to the admission of the surveillance videos, the State would have added the necessary witnesses to its witness list or otherwise sought permission from the trial court to establish the necessary foundations for those videos. Accordingly, the post-conviction court's resolution of this claim is not contrary to law.

[50]     Second, Conley argues that her trial counsel unreasonably failed to request a supplemental "reasonable theory of innocence" jury instruction. Appellant's Br. at 46. As our Supreme Court has explained:

> [W]hen the trial court determines that the defendant's conduct required for the commission of a charged offense, the *actus reus*, is established exclusively by circumstantial evidence,[6] the jury should be instructed as follows: *In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence.*

*Hampton v. State*, 961 N.E.2d 480, 491 (Ind. 2012) (italics in original). Our Supreme Court added:

> Such a supplemental instruction is a safeguard urging jurors to carefully examine the inferences they draw from the evidence presented, thereby helping to assure that the jury's reasoning is sound. Additionally, it serves to "reiterat[e] the magnitude of the ['proof beyond a reasonable doubt'] standard to juries when the evidence before them is purely circumstantial." In this regard, the "reasonable theory of innocence" instruction informs the jury that if a reasonable theory of innocence can be made of the circumstantial evidence, then there exists a reasonable doubt, and the defendant is entitled to the benefit of that doubt.
>
> Such a "reasonable theory of innocence" instruction, when appropriate, is not satisfied by the instruction on reasonable doubt. The State argues that . . . that the "reasonable theory of

---

[6] There is no dispute in this appeal that the State's case against Conley was established exclusively by circumstantial evidence.

innocence" instruction is a way of restating "proof beyond a reasonable doubt" [and] renders the instruction "duplicitous." To the contrary, providing the jury with an additional cautionary instruction in evaluating circumstantial evidence not only supports but further enhances the concept of requiring proof beyond a reasonable doubt. It admonishes the jury to tread lightly where the evidentiary gap between logical certainty and guilt is more tenuous.

*Id.* at 486-87 (first two alterations original to *Hampton*; footnote and citations omitted).

[51] Conley's trial counsel testified to the post-conviction court that he did not request a supplemental reasonable-theory-of-innocence instruction to be given to the jury because he thought the instructions that were given, along with his emphasis during closing argument on the other possible suspects, sufficed to get the same essential ideas to the jury. The trial court gave the following instruction to the jury:

> Under the law of this State, a person charged with a crime is presumed to be innocent. This presumption of innocence continues in favor of the Defendant throughout each stage of the trial, and *you should fit the evidence presented to the presumption that the Defendant is innocent if you can reasonably do so.*
>
> *If the evidence lends itself to two reasonable interpretations, you must choose the interpretation consistent with the Defendant's innocence.* If there is only one reasonable interpretation, you must accept that interpretation and consider the evidence with all the other evidence in making your decision.

> To overcome the presumption of innocence, the State must prove the Defendant guilty of each element of the crime charged beyond a reasonable doubt. . . .

Appellant's Direct Appeal App. Vol. 3, p. 47 (emphasis added). The trial court similarly instructed the jury:

> The burden is upon the State to prove beyond a reasonable doubt that the Defendant is guilty of the crime charged. It is a strict and heavy burden. *The evidence must overcome any reasonable doubt concerning the Defendant's guilt*, but it does not mean that a Defendant's guilt must be proved beyond all possible doubt.
>
> A reasonable doubt is a fair, actual, and logical doubt based upon reason and common sense. A reasonable doubt may arise either from the evidence or from a lack of evidence. Reasonable doubt exists when you are not firmly convinced of the Defendant's guilt after you have weighed and considered all the evidence.
>
> A Defendant must not be convicted on suspicion or speculation. It is not enough for the State to show that the Defendant is probably guilty. On the other hand, there are very few things in this world that we know with absolute certainty. The State does not have to overcome every possible doubt.
>
> The State must prove each element of the crime by evidence that firmly convinces each of you and leaves no reasonable doubt. The proof must be so convincing that you can rely and act upon it in this matter of the highest importance.
>
> If you find that there is a reasonable doubt that the Defendant is guilty of the crime, you must give the Defendant the benefit of that doubt and find the Defendant not guilty of the crime under consideration.

*Id.* at 48 (emphasis added).

[52] We are not persuaded by Conley's argument that her trial counsel's failure to request a supplemental reasonable-theory-of-innocence instruction amounted to constitutionally deficient performance. We do agree with Conley that *ideally* her trial counsel would have requested the supplemental instruction for the reasons explained by our Supreme Court in *Hampton*. But the representation guaranteed by the Sixth Amendment does not require ideal representation; it requires minimally competent representation. *See Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012). And Conley's trial counsel used the evidence and instructions that were before the jury to make the same essential points that would have been covered by a supplemental reasonable-theory-of-innocence instruction. Accordingly, she received constitutionally sufficient performance from her counsel on this issue.

## 3. The post-conviction court did not err in denying Conley's petition.

[53] Having concluded that Conley's trial counsel deficiently failed to challenge Vera's testimony but reasonably stipulated to the surveillance videos and reasonably proceeded without the supplemental jury instruction, we thus turn to the second prong of the *Strickland* analysis. Again, this part of the analysis requires Conley to demonstrate a "reasonable probability that, but for counsel's errors, the [trial] would have resulted in a different outcome. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Wilson*, 157 N.E.3d at 1177.

[54] Vera's inadmissible testimony was unquestionably prejudicial, and, as explained above, trial counsel allowing the jury to hear her testimony about Conley's alleged threat cannot be rationalized or justified. That said, looking to the record as a whole, our confidence in the jury's verdict against Conley is not undermined by her counsel's mistake. The State's case against Conley was not just compelling, it was overwhelming. Conley's motive for the murder was thoroughly demonstrated by her many messages to Martinez leading up to the shooting. Just hours after the shooting, Conley, without prompting, texted Desha that Conley's car-location information would prove her innocence. Conley said likewise to officers. Conley conveniently failed to mention to investigators that she had borrowed Graham's car. Thus, the State's evidence made clear that, not only did Conley have a motive for killing Martinez, she had attempted to set up an alibi and attempted to hide her use of Graham's car.

[55] Further, shortly after the murder, Conley inexplicably needed a new cell phone. While her prior phone was never recovered, the location information of her prior phone made clear that Conley had traveled from Graham's residence to Martinez's residence. Conley was there at the time of the murder and left at a time consistent with the 9-1-1 calls. Conley's prior cell-phone location information also aligned with the license-plate reader and the surveillance videos of Graham's car. And Conley's internet history following the murder spoke to a guilty mind. Further, despite Conley's defense, the State thoroughly explained how it had investigated the numerous other suspects and why it had eventually excluded all of them as suspects.

[56] Accordingly, we conclude that there is no reasonable probability that, but for trial counsel's mistake with respect to Vera's testimony, the result of Conley's trial would have been different. We therefore affirm the post-conviction court's denial of her petition for post-conviction relief.

## Conclusion

[57] For all of these reasons, we affirm the post-conviction court's judgment.

[58] Affirmed.

Kenworthy, J., and DeBoer, J., concur.

ATTORNEYS FOR APPELLANT

Amy E. Karozos
Public Defender of Indiana

Lindsay Van Gorkom
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana